# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

EDWARD D. SCHULER
ADC 140938, *et al.*                                                         PLAINTIFFS

V.                              No. 2:20CV00097-DPM-JTR

DEXTER PAYNE, Director,
Arkansas Department of Correction, *et al.*                    DEFENDANTS

## RECOMMENDED DISPOSITION

The following Recommended Disposition has been sent to Chief United States District Judge D.P. Marshall Jr. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not file objections, Judge Marshall may adopt this Recommendation without independently reviewing all of the evidence in the record. By not objecting, you may waive the right to appeal questions of fact.

## I. Introduction

Plaintiffs Edward D. Schuler ("Schuler"), Joshua Curl ("Curl"), Robert Draft ("Draft"), Donnie B. James ("James"), Taurin Johnson ("Johnson"), Michael McDowell ("McDowell"), and John J. Smith ("Smith") are prisoners in the East

Arkansas Regional Unit ("EARU") of the Arkansas Division of Correction ("ADC"). On May 13, 2020, they filed this § 1983 action seeking injunctive relief and alleging that Defendants Secretary of Correction Wendy Kelley, ADC Director Dexter Payne, Warden Gaylon Lay, Deputy Warden Emmer Branch, and Deputy Warden Anthony Jackson ("Defendants") are violating their Eighth Amendment rights by implementing medical protocols that do not adequately protect them from COVID-19.[1] *Doc. 2.*

On June 18, 2020, Defendants filed summary judgment papers arguing that all of Plaintiffs' claims should be dismissed because none of them exhausted their administrative remedies as required by the PLRA. *Docs. 39, 40, 41.*

In Plaintiffs' Response, filed on June 24, 2020, they do not challenge Defendants' position that they each have failed to fully and properly exhaust their administrative remedies on the claims they are asserting in this action. *Doc. 46.* Instead, Plaintiffs contend they should be excused from complying with the PLRA's mandatory exhaustion requirement because: (1) the "anticipatory" nature of their claims, on May 13, 2020, made the exhaustion process "unavailable" to them; and

---

[1]On June 11, 2020, Chief United States District Judge D.P. Marshall Jr. entered an Order denying Plaintiffs' motion for preliminary injunction, but allowing their Eighth Amendment claim to go forward. In anticipation of Defendants filing a dispositive motion arguing that Plaintiffs failed to exhaust their administrative remedies before initiating this action, as required by the Prison Litigation Reform Act ("PLRA"), Judge Marshall requested me to submit "an expedited recommendation" on any such motion that might be filed. *Doc. 31 at 7.*

(2) the COVID-19 pandemic is a "special circumstance" that excuses them from complying with the PLRA's exhaustion requirement. *Id. at 1-5.* On June 25, 2020, Defendants filed a Reply. *Doc. 47.*

For the reasons explained below, the Court recommends granting Defendants' Motion for Summary Judgment, [2] and dismissing Plaintiffs' claims, without prejudice, based on their failure to exhaust administrative remedies.

## II. Discussion

### A.    The PLRA's Mandatory Exhaustion Requirements

The PLRA requires prisoners to exhaust all available administrative remedies *before* filing a § 1983 action: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The purposes of the exhaustion requirement include "allowing a prison to address complaints about the

---

[2]Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex,* 477 U.S. at 323. Thereafter, the nonmoving party must present specific facts demonstrating that there is a material dispute for trial. *See* Fed R. Civ. P. 56(c); *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011).

program it administers before being subjected to suit, reducing litigation to the extent complaints are satisfactorily resolved, and improving litigation that does occur by leading to the preparation of a useful record." *Jones v. Bock,* 549 U.S. 199, 219 (2007). In *Woodford v. Ngo*, 548 U.S. 81, 85 (2006), the Court held that the PLRA's exhaustion requirement is "mandatory." *See also Muhammad v. Mayfield,* 933 F.3d 993, 1000 (8th Cir. 2019).

The PLRA requires inmates to: (1) *fully and properly* exhaust their available administrative remedies *as to each claim* that is later raised in a § 1983 action; and (2) complete the exhaustion process *before* initiating the § 1983 action. *Jones,* 549 U.S. at 211, 219-20, 223-24; *Woodford,*, 548 U.S. at 93-95; *Burns v. Eaton,* 752 F.3d 1136, 1141-42 (8th Cir. 2014). Importantly, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218; *see also Woodford*, 548 U.S. at 90 (explaining that administrative exhaustion "means using all steps that the agency holds out, and doing so properly so that the agency addresses the issues on the merits"). Thus, to satisfy the PLRA, a prisoner must comply with the exhaustion requirements of the incarcerating facility before he can properly file a § 1983 action.

The ADC provides the following three-step administrative process that prisoners must comply with to exhaust non-emergency grievances raising

"complaints, problems and other issues": (1) file a "Step One" informal resolution raising the claim or matter with the designated unit-level problem-solver; (2) if the informal resolution is denied, file a "Step Two" formal unit-level grievance with the Warden; and (3) if the Warden denies the grievance, file a "Step Three" appeal with the appropriate ADC Chief Deputy/Deputy/Assistant Director. ADC Administrative Directive 19-34 §§ I & IV(E)-(G) ("AD 19-34").[3] According to AD 19-34 § IV(G)(9), the "entire grievance procedure [for non-emergency grievances] should [normally] be completed within seventy-six (76) working days[.]"

Importantly, AD 19-34 § III(F) defines "emergency" as "a problem that, if not immediately addressed, subjects the inmate to a substantial risk of personal injury or other serious and irreparable harm." If confronted with a problem that qualifies as an "emergency," this provision authorizes an inmate to file an "emergency grievance" and, if the staff member who receives the emergency grievance agrees that it involves "an emergency," the grievance goes directly "to the Warden … at the unit without the completion of Step One." However, "if the staff recipient [of the emergency grievance] determines that no Emergency exists, the informal resolution form shall be processed within the normal limits stated within this policy." AD 19-

---

[3]Defendants submitted, with their summary judgment papers, a copy of AD 19-34, which became effective on December 2, 2019. *Doc. 39, Ex. L.*

34 § IV(E)(5).

Finally, AD 19-34 § IV(E)(5) provides that, after a staff member forwards an emergency grievance to the Warden, "corrective action shall be taken as soon as possible and within no more than twenty-four (24) hours."[4] By carving out this emergency grievance procedure, *within the regulations governing Step One informal resolutions*, the ADC makes it clear that: (1) once the staff recipient concludes the emergency grievance involves an emergency matter, it goes directly to the Warden, who must decide the emergency grievance within twenty-four hours of receiving it; and (2) none of the regulations that follow in § IV(F), *which governs "Step Two: the Formal Grievance Procedure" for non-emergency grievances*, are applicable to emergency grievances, which are governed solely by the language in § III(F) and § IV(E)(5).

Section IV(E)(5) is *silent* on whether a unit Warden's denial of an emergency grievance is final or must be appealed to an ADC Deputy Director under the same rules that govern a unit Warden's denial of a non-emergency grievance. *If* the ADC intended for inmates to file a Step Three appeal of a unit Warden's denial of an emergency grievance, an expedited appeal process should have been included in §

---

[4] Section § III(F) specifies that the unit Warden is the decision-maker on properly designated emergency grievances. This means that he or she must take action and decide the emergency matter "within no more than twenty-four (24) hours" of receiving the emergency grievance.

IV(E)(5), to make it align with the specific requirement that a unit Warden must decide an emergency grievance within twenty-four hours or less of receiving it. The fact that § IV(E)(5) mentions *nothing* about an inmate being required to appeal a unit Warden's denial of an emergency grievance strongly suggests that decision is *final,* and an inmate is not obligated to exhaust any further administrative remedies. Otherwise, by default, an emergency grievance would be treated the same as a non-emergency grievance under § IV(G)(6), and an ADC Deputy Director would have *thirty days* to decide the appeal of a unit Warden's denial of an emergency grievance that was required to be made within *twenty-four hours or less* of submission.

Before they initiated this action, none of the Plaintiffs filed an emergency grievance raising any of their COVID-19 claims. Thus, the Court need not resolve whether a unit Warden's denial of an emergency grievance under § IV(E)(5) is a final decision that ends the exhaustion process, or whether such a denial must be appealed to an ADC Deputy Director, in the same way as the denial of a non-emergency grievance under § IV(G). I will, however, note that the ADC would face an uphill battle in trying to argue, *by analogy,* that the same thirty-day Step Three appeal process for non-emergency Step Two grievances applies to Step One emergency grievances. Such an argument would be nonsensical and utterly inconsistent with the specific language in the Step One regulations that create an

extremely expeditious process for filing and deciding emergency grievances.[5]

Finally, the ADC grievance policy also requires that, *in all grievances*, a prisoner must "*specifically name each individual involved*," and include a "brief statement that is specific as to the substance of the issue or complaint to include the date, place [and] *personnel involved* or witnesses." AD 19-34 §§ IV(C)(4) & (E)(2) (emphasis added). The grievance forms themselves contain these instructions to ensure prisoners are aware of them. *Id.,* Att. 1 ("[B]e specific as to the complaint, date and place, name of personnel involved and how you were affected.").

## B.    Defendants' Motion for Summary Judgment

In their summary judgment papers, Defendants rely on the following undisputed facts: (1) Plaintiffs *admit* in their Complaint that they did *not* fully and properly exhaust their administrative remedies on any of the claims they are raising in this action (*see Doc. 2 at 5-6*); and (2) Consistent with that admission, Defendants have attached documents and affidavits which establish that *none* of the grievances

---

[5]If I am correct in my hypothetical construction of the ADC's emergency grievance regulations, an inmate should be able to obtain a *final decision* from the Warden on an emergency grievance within two or three days of submitting it to a staff member, and then properly file a § 1983 action in federal court, after having fully exhausted his administrative remedies.

If the ADC were to prevail on a strained construction of those regulations that required an inmate to appeal a unit Warden's denial of the emergency grievance to an ADC Deputy Director, the exhaustion process would increase to approximately 35 days, a period of time that is impossible to reconcile with the emergency grievance procedure in § IV(E)(5), which is explicitly intended to resolve emergency matters within a few days, *not* over the course of many weeks.

that were filed were ever fully and properly exhausted *before* Plaintiffs initiated this action on May 13, 2020. *Doc. 39, Ex. A* (Declaration, dated June 17, 2020, from Debra Mills, EARU Inmate Grievance Coordinator); *Doc. 39, Ex. B* (Declaration, dated June 17, 2020, from Jacqueline Michelle Buterbaugh, the ADC Medical Grievance Supervisor); *Doc. 39, Ex. C* (Declaration, dated June 17, 2020, from Terri Grigsby, the ADC's Inmate Grievance Supervisor); *& Doc. 39, Exs. D-K* (grievances filed by McDowell, Smith, James and Schuler)*; see also Doc. 11 at 7, Doc. 25 at 5-7, & Doc. 32 at 7* (additional grievances filed by Draft, McDowell, Smith, James and Schuler). Accordingly, Defendants argue that this action must be dismissed because none of Plaintiffs' claims have been properly exhausted.[6] *Docs. 39-41.*

Plaintiffs do *not* dispute any of the material facts establishing their failure to fully and properly exhaust administrative remedies on the constitutional claims they are pursuing in this action. Nevertheless, the Court will review their individual attempts to exhaust, such as they are, to put in context their request to be "excused" from complying with the PLRA's mandatory exhaustion requirement.

---

[6]On June 11, 2020, Chief Judge Marshall denied Plaintiffs' motion for class certification "as premature." *Doc. 31 at 7.* Thus, each Plaintiff is required to individually exhaust his administrative remedies on the claims being asserted in this action. *See Mason v. Raemisch,* No. 17cv1013-DDD, 2019 WL 2775509, at *2-3 (D. Colo. July 2, 2019) (because "vicarious exhaustion is inapplicable outside the context of class actions," prisoners could not rely on grievances filed by a co-plaintiff to satisfy the exhaustion requirement as to their individual claims); *Taylor v. Lindamoon,* No. 1:16cv48, 2017 WL 4176338, at *4 (M.D. Tenn. Sept. 19, 2017) (same); *Doss v. Gilkey,* 649 F. Supp. 2d 905, 912-13 (S.D. Ill. 2009) (same).

### C.    Plaintiffs' Respective Efforts to Exhaust Their Administrative Remedies

1.    <u>Plaintiffs Curl and Johnson</u>

Curl and Johnson did not file a single grievance and did *nothing* to exhaust their administrative remedies on the claims raised in this lawsuit. *Doc. 41 ¶¶ 7-9, 43-45.*

2.    <u>Plaintiffs Draft, McDowell, and Smith</u>

While Draft, McDowell, and Smith filed informal resolutions or grievances, all of those documents were filed *after* they initiated this action on May 13, 2020. *See Doc. 41 ¶¶ 10-17, & Doc. 25 at 6* (Draft's Non-Emergency Step One informal resolution dated *June 4, 2020*); *Doc. 41 ¶¶ 46-57, Doc. 39, Ex. G, & Doc. 32 at 7* (McDowell's Emergency Grievance EA-20-00762 dated *May 26, 2020*, and his Emergency Grievance dated *June 4, 2020*); *Doc. 41 ¶¶ 84-94, Doc. 39, Ex. K, & Doc. 25 at 5* (Smith's Non-Emergency Grievance EA-20-00766 dated *May 25, 2020*, and his Non-Emergency Step One informal resolution dated *June 4, 2020*). Accordingly, none of those documents can be considered by the Court in deciding if these Plaintiffs exhausted their administrative remedies on any of the claims they are asserting against Defendants in this action. *See Booth v. Churner,* 532 U.S. 731, 733-34 (2001) (holding that the PLRA "requires a prisoner to exhaust 'such administrative remedies as are available' *before* suing over prison conditions")

(emphasis added); *Johnson v. Jones*, 340 F.3d 624, 627 (8th Cir. 2003) ("Under the plain language of section 1997e(a), an inmate must exhaust administrative remedies *before* filing suit in federal court.").

    3.    <u>Plaintiff James</u>

James filed the following grievances, which Defendants characterize as "tangentially relate[d]" to the claims in this lawsuit: (1) Non-Emergency Grievance EA-20-00549, dated April 22, 2020; (2) Emergency Grievance EA-20-00745, dated May 26, 2020; (3) Non-Emergency Grievance EA-20-00765, dated May 25, 2020; and (4) a Non-Emergency Step One informal resolution dated June 4, 2020. *Doc. 41 ¶¶ 18-42; Doc. 39, Exs. D-F; Doc. 25 at 7.*

Although EA-20-00549 was filed prior to May 13, 2020, it was denied, at Step Two, on May 21, 2020, eight days *after* Plaintiffs initiated this action. *Doc. 39, Ex. D.* Furthermore, because James did *not* pursue a Step Three appeal to the Deputy Director, he failed to exhaust this grievance. *See Porter v. Sturm*, 781 F.3d 448, 451-52 (8th Cir. 2015) (finding incomplete exhaustion when a prisoner failed to "pursue the ... grievance process to its final stage"); *Johnson*, 340 F.3d at 627 ("If exhaustion was not completed at the time of filing [suit in federal court], dismissal is mandatory."); *see also Mosley v. Correctional Care Solutions*, 671 F. App'x 401, 402 (8th Cir. 2016) (dismissal for failure to exhaust was proper where prisoner "filed

a pertinent grievance that was ultimately exhausted after he initiated this [§ 1983] action").

Finally, in EA-20-00549, James states only that: (1) Corporal Anderson refused to put on a face mask on April 18, 2020, which put James in danger of catching COVID-19; and (2) in an earlier visit to 14 Barracks, Corporal Anderson stated that she wished COVID-19 "would wipe out a bunch of these inmates." *Doc. 39, Ex. D.* The grievance did not name or otherwise identify *any* of the Defendants or make any claims against them. *See Townsend v. Murphy,* 898 F.3d 780, 784 (8th Cir. 2018) (holding that ADC prisoner failed to exhaust his administrative remedies as to two named defendants because neither of them were named in the prisoner's grievance, which included no information about their alleged misconduct). Thus, James cannot rely on EA-20-00549, or any of his other grievances, to establish that he exhausted any of the claims asserted in this action.[7]

4.   Plaintiff Schuler

Schuler submitted the following grievances, which Defendants characterize as "tangentially relate[d]" to the claims at issue in this lawsuit: (1) Non-Emergency Grievance EA-20-00332, dated March 16, 2020; (2) Non-Emergency Grievance EA-

---

[7]James's two other grievances and one informal resolution were all filed *after* he initiated this action. *Doc. 39, Exs. E & F; Doc. 25 at 7.* Thus, none of those papers can be used to demonstrate that he exhausted his administrative remedies on the claims he is pursuing in this action.

20-00705, dated May 11, 2020; (3) Emergency Grievance EA-20-00823, dated June 4, 2020; and (4) a Non-Emergency Step One informal resolution, dated May 26, 2020. *Doc. 41 ¶¶ 58-83; Doc. 39, Exs. H-J; Doc. 11 at 7.*

Although Schuler filed EA-20-00332 *prior to* May 13, 2020, his Step Three appeal was not final until May 28, 2020, more than two weeks *after* he initiated this action. Furthermore, in that grievance, Schuler complained only that, on March 16, 2020, Corporal Anderson entered 14 Barracks and stated that she hoped COVID-19 "started here to wipe some of the inmates out." *Doc. 39, Ex. H.* The grievance did not name or otherwise identify any of the Defendants or make any allegations against them.

Similarly, while EA-20-00705 was filed before May 13, 2020, it was denied, *at Step Two,* on June 16, 2020. *Doc. 39, Ex. I.* Substantively, Schuler complained only that Captain Stephen Lane was not wearing his face mask at 3:40 p.m. on May 11, 2020. The grievance did not name or otherwise identify any of the Defendants or make any allegations against them.

Finally, Schuler initiated an informal resolution on May 26, 2020, and filed Emergency Grievance EA-20-00823 on June 4, 2020, several weeks *after* this lawsuit was initiated on May 13, 2020. Accordingly, he cannot rely on any of those grievances to establish exhaustion.

**D.    Plaintiffs' Arguments That They Should Be Excused from Complying with the PLRA's Exhaustion Requirement**

First, Plaintiffs speculate that, because the EARU had no confirmed COVID-19 cases when they filed their Complaint on May 13, 2020, any grievances they filed before that date raising health concerns related to how the EARU was responding to the pandemic would have been dismissed as non-grievable "anticipated events." According to Plaintiffs, this made the EARU grievance process "unavailable" to them. *Doc. 46 at 1-2 & 4-5.*

Second, they argue that the pandemic itself is a "special circumstance" that obviates the PLRA's otherwise mandatory exhaustion requirement. *Id. at 2-4.*

1.    <u>Plaintiffs' Argument That the EARU Grievance Process Was Unavailable to Them, On or Before May 13, 2020, is Specious and Without Merit</u>

The ADC's grievance policy prohibits prisoners from grieving "anticipated events," which are defined as "events or activities which may or may not occur in the future." AD 19-34 § III(H)(6). Plaintiffs contend that, if they had attempted to grieve anything related to COVID-19 before the virus "had … reached the interior walls" of EARU on June 4, 2020,[8] the grievance would have been rejected because

---

[8]On June 4, 2020, the ADC first became aware that an asymptomatic EARU inmate had tested positive for COVID-19. *Doc. 22, Ex. A ¶ 3* (Payne Decl.). However, as early as March, it was widely known that many of those infected with the virus remained asymptomatic (but contagious to others) or had mild symptoms that they recovered from within a few days. On March 11, 2020, Arkansas Governor Hutchinson announced the first presumptive case of COVID-19 in

14

it raised a claim based on an "anticipated event." Thus, they argue the grievance process was unavailable to them at the time they initiated this action on May 13, 2020.

However, in their Complaint, Plaintiffs allege that, *in March, April and May*, as the pandemic spread, Defendants refused to: ban unit-to-unit and barracks-to-barracks transfers; implement and enforce adequate social distancing efforts; adequately clean and disinfect living areas and bathrooms; issue adequate masks to staff and inmates and enforce their use; provide access to hand sanitizer and gloves; and ensure the availability of ventilators and respirators. *See Doc. 2 at 6-17.* All of those specific and concrete decisions by Defendants were made and implemented many weeks *before* May 13, 2020, and were in no way "anticipatory" or based on

---

Arkansas. *Doc. 16, Ex. 1 ¶ 13* (Payne Decl.). On March 23, 2020, the United States Centers for Disease Control and Prevention issued guidance on COVID-19 that was specifically directed at correctional and detention facilities. *Id., Ex. 9.* On March 27, 2020, the Arkansas Department of Health issued its own recommendations, providing guidance to state correctional facilities. *Id., Ex. 10.*

By late March, prisoners across the country were filing § 1983 cases raising deliberate indifference claims about incarceration facilities not adequately protecting them from COVID-19. *See, e.g., Nellson v. Barnhart,* D. Colo. No. 1:20cv756-PAB (federal prisoners' class action filed March 18, 2020); *Amos v. Hall,* N.D. Miss. No. 4:20cv7-DMB (state prisoners' emergency motion for TRO filed March 16, 2020); *Valentine v. Collier,* S.D. Tex. No. 4:20cv1115 (state prisoners' complaint and application for TRO filed March 30, 2020). Thus, by late March, every Plaintiff knew or certainly should have known they were in a high-risk environment for contracting the disease and they knew tests were not being widely administered to prisoners in the EARU. To the extent they believed, in late March of 2020, that Defendants were being deliberately indifferent to their health and safety in the way they were responding to COVID-19, each Plaintiff was in a position to file an emergency grievance raising those *concrete problems and concerns,* which were in no way "anticipatory."

events that "may or may not occur in the future." Furthermore, according to Plaintiffs' own allegations in their pleadings, it was those decisions which allowed COVID-19 to enter the EARU *before* May 13 and begin to spread among the inmate population, even though the first EARU inmate did not test positive until June 4, 2020.[9]

Plaintiffs unquestionably could have filed emergency grievances, *on concrete grievable matters*, at least as early as late March of 2020.[10] Thus, the language in AD 19-34 § III(H)(6), which prohibits prisoners from grieving "anticipated events," in no way precluded Plaintiffs from filing and exhausting grievances in March, April and early May raising the claims they are now asserting in this action.

---

[9]Nothing in the record indicates the full extent to which EARU may have started to test prisoners for COVID-19 prior to June 4, 2020. If widespread testing started on or about June 4, 2020, it would explain why no inmates were diagnosed with the virus before that date.

However, at least by late March or early April, it appears that EARU medical staff were testing inmates for COVID-19 if they presented with respiratory symptoms. Plaintiff Schuler alleges that, on April 2, 2020, he was tested for COVID-19 (with negative results), when he received medical treatment at the EARU for a respiratory infection. *Doc 4 at 4.* The EARU inmate who tested positive on June 4 was *asymptomatic,* but was tested at an off-site medical appointment. *Doc. 22, Ex. A ¶ 3* (Payne Decl.). The next day, June 5, EARU medical staff began testing every inmate. *Id. ¶ 6.*

[10]In making this argument, Plaintiffs appear to have forgotten that *none* of the COVID-related non-emergency grievances they filed in March and April were rejected because they raised an "anticipated event." *See Doc. 47 at 4.*

2.     Plaintiffs Have Not Established Any "Special Circumstances" to Excuse Their Failure to Comply with the ADC's Grievance Procedures

According to Plaintiffs, the Court should also excuse their failure to exhaust because the COVID-19 pandemic is a "special circumstance" that Congress did not take into account when it enacted the PLRA. However, in *Ross v. Blake,* 136 S. Ct. 1850, 1862 (2016), the Court made it clear that unwritten judicially-created "special circumstances" may not be engrafted "onto the PLRA's exhaustion requirement. The only limit to § 1997e(a)'s mandate is the one baked into its text: An inmate need exhaust only such administrative remedies as are 'available.'"[11] The Court went on to explain the kind of circumstances that make an administrative remedy "*not available*": (1) when the process "operates as a simple dead end," with officials unable or consistently unwilling to provide any relief; (2) when the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; or (3) when prison officials thwart inmates from taking advantage of a grievance process through "machination, misrepresentation, or intimidation." *Id.* at 1859-60; *see Muhammad,* 933 F.3d at 1000 (stating that *Ross* recognizes "at least three circumstances" where an administrative remedy is unavailable); *Ramirez v. Young,* 906 F.3d 530, 538 (7th Cir. 2018) (noting that the three circumstances described in

---

[11]*Ross* explicitly *overruled* the decisions in *Brownell v. Krom,* 446 F.3d 305 (2d Cir. 2006), and *Giano v. Goord,* 380 F.3d 670 (2d Cir. 2004), which Plaintiffs attempt to rely on to support their argument.

*Ross* "were only examples, not a closed list").

In *Valentine v. Collier,* 140 S. Ct. 1598 (2020), inmates at a geriatric prison in Texas alleged that administrators were failing to protect them from the dangers of COVID-19 in violation of their Eighth Amendment rights. The trial court granted their request for a preliminary injunction and ordered the prison to "follow an extensive protocol, including frequent cleaning and increased education efforts." The Fifth Circuit Court of Appeals stayed the injunction, finding, among other things, that the prisoners were required to exhaust their administrative remedies. *Id.* at 1598. On appeal to the United States Supreme Court, Justice Alito denied the prisoners' application to vacate the stay of injunctive relief.[12] *Id.*

On remand, the trial court (after further briefing and additional development of the facts) concluded that the prison's grievance procedure was "unavailable" because it was "indeed 'utterly incapable'" of providing "meaningful relief to [the

---

[12]Justice Sotomayor, joined by Justice Ginsburg, filed a separate statement elaborating on the kind of things that might relieve a prisoner of the obligation to exhaust administrative remedies. According to Justice Sotomayor, "if a plaintiff has established that the prison grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19, the procedures may be 'unavailable' to meet the plaintiff's purposes, much in the way they would be if prison officials ignored the grievances entirely. … [I]n these unprecedented circumstances, where an inmate faces an imminent risk of harm that the grievance process cannot or does not answer, the PLRA's textual exception could open the courthouse doors where they would otherwise stay closed." *Valentine,* 140 S. Ct. at 1600-01. However, Justice Sotomayor made it clear that "availability" is a fact-based analysis. *Id.* at 1600 (stating that "when 'the facts on the ground' indicate that the grievance procedure provides no possibility of relief[,] the procedures may well be 'unavailable'") (quoting *Ross,* 136 S. Ct. at 1859).

plaintiffs'] COVID-related grievances under the normal process in the face of a rapidly spreading pandemic." *Valentine v. Collier,* No. 4:20-cv-1115, 2020 WL 3491999, at *5-9 (S.D. Tex. June 27, 2020). In support of its decision, the court noted that: (1) the grievance process was "not designed to field requests for swift, prison-wide preventative measures"; (2) the grievance process took over two months to complete, and had no provision for emergency relief; and (3) prison officials responded in a "piecemeal" manner to the prisoners' grievances and were "unable or unwilling to timely provide the minimum level of swift, coordinated relief" that was needed to adequately protect them. *Id. See Maney v. Brown,* No. 6:20cv570-SB, 2020 WL 2839423, at *8 & *11 (D. Or. June 1, 2020) (holding that, while COVID-19 "did not automatically render a prison grievance system unavailable," the Oregon prison's procedures were "unavailable" because officials were not accepting grievances related to COVID-19 emergency operations); *McPherson v. Lamont,* __ F. Supp. 3d __, 2020 WL 2198279, at *9-10 (D. Conn. May 6, 2020) (concluding that the Connecticut state prisons' grievance process was "unavailable" because it was "inadequate to the task of handling Plaintiffs' urgent complaints regarding their health" in the COVID-19 pandemic, did not contain an emergency review process, and could take up to 105 business days to complete); *cf. Frazier v. Kelley,* __ F. Supp. 3d __, 2020 WL 2561956, at *7-11, *24-25 (E.D. Ark. May 19, 2020) (finding

there were unresolved questions of fact surrounding the availability of ADC administrative remedies where several plaintiffs incarcerated in the Cummins, Varner Supermax, and Ouachita River Correctional Units *specifically alleged* that staff members refused to sign COVID-related grievances, retaliated against prisoners for filing grievances, and refused to treat "emergency grievances" as emergencies).

Other district courts have held that COVID-19 does *not* automatically render all prison grievance procedures unavailable and that prisoners must still exhaust administrative remedies, as required by the PLRA, unless they encounter circumstances like the ones described in *Ross. See Ball v. Ohio,* No. 2:20cv1759, 2020 WL 1956836, at *3 (S.D. Ohio Apr. 23, 2020) ("Plaintiff failed to properly exhaust his administrative remedies before seeking judicial relief. … [T]he exhaustion requirements of the PLRA are mandatory and may not be altered for special circumstances.") (citing *Ross,* 136 S. Ct. at 1856-57); *Nellson v. Barnhart,* __ F. Supp. 3d ___, 2020 WL 1890670, at *5 (D. Colo. Apr. 16, 2020) ("The Court finds that plaintiff has failed to exhaust his administrative remedies before seeking judicial relief. … [T]he Court may not alter the mandatory requirements of the PLRA for COVID-19 or any other special circumstance.") (citing *Ross,* 136 S. Ct. at 1856-57).

*Valentine* reinforces the reasoning of the district courts in *Ball* and *Nellson* by making it clear that COVID-19 itself is not a "special circumstance" that automatically renders a prison's grievance system unavailable. Rather, as Justice Sotomayor suggested, in appropriate cases courts should conduct a fact-based inquiry, and determine whether the "grievance procedures at issue are utterly incapable of responding to a rapidly spreading pandemic like Covid-19[.]" *Valentine,* 140 S. Ct. at 1600.

Here, Plaintiffs have made *no attempt* to demonstrate that the grievance process at EARU "provide[d] no possibility of relief" or was "utterly incapable of responding to a rapidly spreading pandemic like Covid-19."[13] Plaintiffs also do not allege that EARU staff members refused to sign their COVID-related grievances,

---

[13]The non-emergency grievances that were filed by Plaintiffs before May 13, 2020 were never fully exhausted and they all asserted claims related to specific instances of EARU guards not wearing masks on certain dates or of guards making comments about prisoner health not being important to them. None of those grievances asserted *any claims*, constitutional or otherwise, against any of the named Defendants. Thus, *before initiating this action,* two of the Plaintiffs filed no grievances at all and the other five Plaintiffs made only a token effort to exhaust their administrative remedies by filing non-emergency grievances that did not name any of the Defendants and involved only specific complaints about matters that were, at best, only tangentially related to the claims they are asserting in this action.

Finally, *after* initiating this action, Plaintiffs James, McDowell and Schuler filed four "Emergency Grievances." *Doc. 39, Ex. E* (James's Emergency Grievance EA-20-00745, dated May 26, 2020), *Ex. G* (McDowell's Emergency Grievance EA 20-00762, dated May 26, 2020); *Ex. J* (Schuler's Emergency Grievance EA 20-00823, dated June 4, 2020); *Doc. 32 at 7* (McDowell's Emergency Grievance dated June 4, 2020). For that reason, none of those emergency grievances are relevant or material to Plaintiffs' argument that they should be excused from complying with the PLRA's exhaustion requirement.

retaliated against them for filing those grievances, or did anything to make the grievance process unavailable to them. *See Frazier v. Kelley, supra.* The ADC's emergency grievance procedure allows inmates to bring matters posing a "substantial risk of personal injury or other serious or irreparable harm" to a unit Warden's attention on an *expedited basis. Because none of the Plaintiffs ever attempted to file an emergency grievance raising any of their claims before initiating this action*, they are in no position to credibly argue the EARU grievance process was unavailable to them.[14]

Finally, based on the parties' preliminary injunction papers and the undisputed affidavits from Defendants and others, in February of 2020, EARU began to take steps to prevent the transmission and spread of COVID-19 among staff and inmates in that facility. *See Doc. 16 & Exhibits; Doc. 22.* Chief Judge Marshall summarized these escalating efforts in his June 11, 2020 Order denying preliminary injunctive relief:

> Though the record is thin about how many inmates and staff were being tested, it appears the ADC's measures to keep the virus out of the EARU were successful during the early months. Late last week, though, an inmate at EARU tested positive. The prison responded immediately, locking down that inmate's housing pod, testing everyone in it, and contact tracing to determine who might have been exposed. According to public information from the Governor's daily press briefing, which

---

[14]The Step One form explains how an inmate should complete it to create an "Emergency Grievance." Thus, Plaintiffs cannot argue that they were unaware of how to file an emergency grievance.

the Court judicially notices, positive cases in the EARU are increasing dramatically. For example, on June 10th, there were sixty new positive cases in the ADC; and most of those were from the EARU. The prison plans to test every inmate at EARU by this Friday, June 12th. There are approximately 1500 inmates there. The number of positive cases will probably rise. As the test results are received, ADC says it will divide the inmates based on their results. The Unit has also redoubled its efforts on disinfecting and surface cleaning; and it has plans for a field hospital to serve as an infirmary for infected inmates. *Doc. 22.* This response is robust and reasonable. …

…The inmates face significant risk; but requiring the prison to change course on its response would have consequences of its own. There's apparently no available bed space in the ADC, for example, to move a significant number of EARU prisoners to. Aside from the call to release prisoners to reduce population – a high hill that the inmates haven't yet climbed – it's not clear the proposed measures would yield significantly better results. Indeed, the ADC has implemented some of those measures, or variants of them. For example, it has issued one cloth face mask to every inmate and is working on providing each a second mask. ADC has also installed stations that dispense non-alcohol-based hand sanitizer, beefed up barracks cleaning with disinfectant, and is providing free soap. Staff are supposed to be masked, though the inmates affirm that from time to time some staff are not.

*Doc. 31 at 4-5.*

The steps taken by the ADC to control the transmission of COVID-19 among EARU inmates makes it clear that these efforts began in late February and escalated month to month as the health threat increased. Given the nature of those efforts, there is *nothing* in the record which suggests Plaintiffs' use of the EARU's "emergency grievance" procedure, in March, April and early May, would have been "unavailing" or "ineffective." To the contrary, as the EARU ramped up its response to the virus,

Plaintiffs had the opportunity to use the emergency grievance procedure to raise their own COVID-19 health concerns directly with the Warden. Because Plaintiffs elected *not* to file any emergency grievances raising those health concerns, *before they initiated this action*, there is no way of knowing if the Warden's final decision on those grievances might have provided Plaintiffs with some of the relief they now seek from the Court.

## III. Conclusion

Plaintiffs have presented *no facts* suggesting that EARU's grievance process was unavailable to them, and none of the circumstances like the ones described by the Court in *Ross* or by Judge Baker in her recent decision in *Frazier v. Kelley, supra*, are present in this case.[15]   Plaintiffs' position on exhaustion is further undermined by the fact that none of them: (1) filed an emergency grievance before initiating this action; (2) filed a properly exhausted non-emergency grievance before initiating this action; or (3) filed *any* grievances, before initiating this action, that specifically

---

[15]As previously noted, district courts in Texas, Oregon, and Connecticut have recently held that prison grievance procedures in those states were "unavailable" to prisoners grieving COVID-19 claims. *Valentine,* 2020 WL 3491999, at *5-9; *Maney,* 2020 WL 2839423, at *11; *McPherson,* 2020 WL 2198279, at *9-10. However, in all three of those cases, the courts relied on specific facts which established the respective grievance procedures were *not* capable of providing "the minimum level of swift, coordinated relief" needed to protect the prisoners from COVID-19, thereby making the grievance procedures "unavailable." Furthermore, in the Texas and Connecticut cases, the district courts emphasized that the grievance processes in those states took two or three months to complete and did *not* contain an *emergency grievance procedure* for quickly addressing emergency matters. None of those circumstances are present in this case.

24

named *any* of the Defendants or raised *any* of the COVID-19 claims they are now pursuing in this action.

Although not utilized by Plaintiffs, the EARU's emergency grievance procedure would have allowed them to raise and expeditiously exhaust their COVID-19 claims against Defendants. Nothing in the record suggests that the EARU's emergency grievance procedure was not available to Plaintiffs or that it was not capable of being used quickly and efficiently to grieve their COVID-19 claims *before* initiating this action on May 13, 2020. These undisputed facts weigh heavily against Plaintiffs' argument that they should be excused from the PLRA's mandatory exhaustion requirement based solely on the "special circumstances" created by the COVID-19 pandemic.

The Court concludes that Plaintiffs have failed to exhaust their available and effective administrative remedies by filing timely emergency grievances raising their COVID-19 health concerns with the EARU Warden. The Court further concludes that there are no "special circumstances" in this case that are sufficient to excuse Plaintiffs from complying with the PLRA's mandatory exhaustion requirement. Accordingly, Plaintiffs' claims should be dismissed, without prejudice.[16]

---

[16]Defendants argue that Plaintiffs' claims should be dismissed "with prejudice" and that

IT IS THEREFORE RECOMMENDED THAT:

1.      Defendants' Motion for Summary Judgment (*Doc. 39*) be GRANTED

with respect to all claims that Plaintiffs have asserted against them.

2.      This action be DISMISSED, in its entirety, without prejudice.

DATED this 8ᵗʰ day of July, 2020.

_____
UNITED STATES MAGISTRATE JUDGE

---

the Court should assess a "strike" against each Plaintiff under 28 U.S.C. § 1915(g). Both of those arguments are without merit. *See Porter,* 781 F.3d at 452 (holding that "[d]ismissal without prejudice is mandatory" where prisoner did not exhaust his administrative remedies); *Owens v. Isaac,* 487 F.3d 561, 563 (8th Cir. 2007) (holding that dismissal without prejudice for failure to exhaust administrative remedies is "not a strike" under § 1915(g)); *see also Springer v. Caple,* 717 F. App'x 650, 651 (8th Cir. 2018) (modifying district court's dismissal to clarify that dismissal for failure to exhaust must be without prejudice).